UNITED STATES of America,
Plaintiff-Appellee,

v.

Stanley B. KIMBROUGH,
Defendant-Appellant.

No. 75–1646.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 11, 1975.

Decided Jan. 23, 1976.

Kenneth L. Cunniff, Chicago, Ill., for defendant-appellant.

Samuel K. Skinner, U. S. Atty., Daniel E. Reidy, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before SPRECHER, TONE and BAUER, Circuit Judges.

BAUER, Circuit Judge.

Defendant-appellant Stanley Kimbrough was named in a one count indictment charging that he assaulted Annette Stewart, who was a United States Postal Carrier, with the intent to steal the mail in violation of 18 U.S.C. § 2114.[1] Following a three day trial the jury returned a verdict of guilty and Kimbrough was sentenced under 18 U.S.C. § 4208.

The evidence presented at trial, taken in the light most favorable to the government, indicates that at approximately 11:00 a. m. on February 20, 1975, Postal Carrier Stewart was delivering the mail along her route in the 6500 block of Drexel Avenue. The day was warm and sunny. As Stewart arrived at the first house on the block, she noticed two men standing on the sidewalk about one-half of the way down the block. One of the men was tall and thin. He wore pink trousers, a brown jacket and a red cap. The other man was short and fat. He wore a black jacket, black trousers and a dark blue cap. The fat man was carrying a white shopping bag and a length of rope.

Stewart and the two men were the only people on the street that morning. She continued to observe the two men as she moved down the block toward them making her deliveries. After making a delivery at 6533 Drexel she returned to her cart on the sidewalk; the fat man was standing adjacent to the cart with a bundle of mail in one hand and the white shopping bag in the other. Stewart said to him, "I wouldn't do that if I were you". He looked at her for approximately thirty seconds, then dropped the bundle of mail back into her cart and walked down the block with his companion. Stewart and the fat man were approximately four feet apart during this encounter. She was able to observe his facial features, as well as his general body shape. As the heavier man walked away from the mail cart, she noticed he "was shaped funny", that is, he had a "wide behind . . . and had round shoulders". Stewart continued to deliver mail. As she entered the hallway at 6551 Drexel with mail in her hand, a man grabbed her collar and said, "Come in, bitch". The man who grabbed her had a rope in his hand and a blue ski

---

1. 18 U.S.C. § 2114 provides, in part:

"Whoever assaults any person having lawful charge, control, or custody of any mail matter or of any money or other property of the United States, with intent to rob, steal or purloin such mail matter, money, or other property of the United States, or robs any such person of mail matter, or of any money, or other property of the United States, shall, for the first offense, be imprisoned not more than than ten years; . . ."

mask over his face. Another male, who was carrying a white shopping bag, was also in the hallway. Stewart screamed, pulled away, ran into the street, and saw the two men exit the hallway of 6551 Drexel and run through the gangway. The man who grabbed her was fat and was wearing a black jacket, black pants and boots. He also had a rope in his hand. She unequivocally identified the man who grabbed her as the same man who had lifted a bundle of mail from her cart a few minutes earlier. However, she also testified that her assailant at this time did not attempt to take any mail nor attempt to take her postal keys.

Immediately after the assault, Stewart notified the police and her superiors of the incident. Postal Inspector Howard Petschel and Special Investigator Robert Bishop interviewed Stewart at the scene and then transported her to their office at the Main Post Office. At the Main Post Office, Inspector Petschel first showed Stewart a composite drawing of a man. She indicated that the drawing resembled the man who assaulted her. Inspector Petschel then showed her a black and white photograph of Kimbrough taken in 1968. She identified the photograph as depicting her assailant, but indicated that he appeared younger in the photograph than he had in person. She then positively identified a recent color photograph of Kimbrough as the man who assaulted her.

Stewart attended a lineup of men with appearances similar to Kimbrough's. She identified Kimbrough during the lineup.

Postal Inspector Howard Petschel testified that he arrested the defendant Stanley Kimbrough. Petschel stated that Kimbrough said "so a woman identified me". Up until that point Petschel had not indicated the gender of the postal employee who had been assaulted.

Postal Inspector Peter Harrison testified that he went to a second floor of a building at 118 East 68th Street. When he entered the apartment he saw the defendant, Inspector Petschel, Inspector Sprange, and Inspector Meyers. In his presence the defendant stated to Petschel "you mean that woman picked me".

The defense presented several witnesses who placed the defendant away from the scene of the assault.

A hearing was held before the trial to enable the court to rule on defendant's motion to suppress Stewart's identification and her expected in-court identification of Kimbrough. The motion was grounded on an alleged deprivation of Kimbrough's due process rights due to suggested pretrial identification procedures. The trial court denied the motion to suppress.

## I. THE TRIAL COURT DID NOT ERR IN DENYING DEFENDANT'S MOTION TO SUPPRESS ON THE BASIS THAT THE PRETRIAL IDENTIFICATION WAS IMPERMISSIBLY SUGGESTIVE.

■ It is the defendant's contention that the identification procedure employed in this case was so impermissibly suggestive that it gave rise to a very substantial likelihood of irreparable misidentification. The facts indicate that after the assault Stewart was quite upset and nervous. On the way to the Main Post Office she was asked to give her assailant's description. Inspector Petschel responded that the description sounded like someone he knew. When they arrived at the Post Office she was handed a composite picture of the defendant which contained the words: "Wanted for strong armed robbery of a postal carrier on Wednesday, December 5, 1973".[2] She was then shown only pictures of Kimbrough[3] despite the fact

---

2. When a witness is presented with a mug shot, i. e., a photo of a person bearing identification numbers indicating that he has been arrested or has been incarcerated, a certain amount of suggestion results. However, when there is also an indication that the person is

currently wanted for a similar crime, it is difficult to understand how any reasonable person would not be influenced.

3. It is well established that the display of pictures of the suspect alone is one of the most

that over a thousand other pictures in files and "mug" books were available to the postal inspectors. The government concedes the suggestive nature of the pretrial identifications employed here warrants a close examination of the victim's identification, but argues that the overall reliability of the victim's identification of the defendant precludes any reversible error or misidentification.[4]

The Supreme Court has recognized that flagrantly suggestive pretrial identification procedures may result in a denial of a defendant's right to due process of law. *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). In *Stovall*[5] the Court stated the test for a violation of a defendant's due process rights, i. e., whether the identification of a particular defendant is "so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied a due process of law . . . depends on the totality of the circumstances surrounding it . . .", 388 U.S. at 302, 87 S.Ct. at 1972. It was in this light that the Court approached the facts of the *Simmons*[6] case where, as in the instant case, only a single picture was used instead of a photo spread. One defendant sought a per se rule that any time a single photo was employed for identification in lieu of a multiple photo spread a violation of constitutional rights would result, thus requiring an exclusion of the evidence at trial or a reversal on due process grounds. Instead the Court chose to take a case by case approach. Following *Stovall* they stated:

". . . we hold that each case must be considered on its own facts, and that conviction based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." 390 U.S. at 384, 88 S.Ct. at 971.

The more recent decision of *Neil v. Biggers*,[7] *supra*, incorporates both the guidelines of *Stovall* and *Simmons* and directs us to ask "whether under the 'totality of the circumstances' the identification was *reliable* even though the confrontation procedure was suggestive." The key element is the reliability of the identification, whether made by a single photo or a photo spread, a lineup of five persons, or a show-up of one person.

---

suggestive and therefore most objectionable methods of pretrial identification. *Simmons v. United States*, 390 U.S. 377, 383, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1967); *Israel v. Odom*, 521 F.2d 1370, 1373 (7th Cir. 1975); *United States v. Cox*, 428 F.2d 683 (7th Cir. 1970); *Kimbrough v. Cox*, 444 F.2d 8, 10 (4th Cir. 1971); *United States v. Workman*, 470 F.2d 151 (4th Cir. 1972); *Mason v. United States*, 134 U.S. App.D.C. 280, 414 F.2d 1176 (1969); *Palmer v. Peyton*, 359 F.2d 199 (4th Cir. 1966).

4. We appreciate the candor of counsel for the government in admitting the identification was suggestive and warranted close scrutiny.

5. *Stovall* involved a situation where the defendant was brought to the victim's hospital room for an identification. Because of the exigencies of the situation the police were forced to hold a show-up in the hospital room. "Faced with the responsibility of identifying the attacker, with the need for immediate action and with the knowledge that [the victim] could not visit the jail, the police followed the

only feasible procedure . . .", 388 U.S. at 302, 87 S.Ct. at 1972.

6. In *Simmons* snapshots of the defendant were shown to the five bank employees who witnessed the robbery. Unlike this case, however, the witnesses also picked the defendant out of a snapshot which contained a group of people. Nor were the pictures admitted at trial; the government relied upon in court identification of the witnesses.

7. The facts in *Neil v. Biggers* indicated that the victim made no identification of the defendant through the use of photographs but identified him at a show-up. However the decision is still closely analogous to the present case because in *Neil* the victim, who was raped, had an unusual opportunity to observe and identify her assailant. Thus her identification was unusually reliable. Similarly in this case the victim had an unusual opportunity to observe the defendant because she saw the defendant clearly in his first attempt to remove mail from her cart.

The *Neil v. Biggers* decision identifies at least five factors that can be used in determining whether an identification was reliable:

(1) the opportunity of the witness to view the criminal at the time of the crime;

(2) the witness' degree of attention;

(3) the witness' prior description of the criminal;

(4) the level of certainty demonstrated by the witness at the confrontation; and

(5) the length of time between the crime and the confrontation.

First of all, a review of the facts in this case indicates that Stewart positively identified the man who assaulted her as the same man who had previously lifted a bundle of mail from her delivery cart. At that time she was within four or five feet of him. They looked directly at each other for approximately one-half of one minute. In addition, Stewart carefully watched her assailant from the time she began delivering the mail on the 6500 block of Drexel, five to seven minutes before the confrontation over the mail bundle. Because the day was bright and sunny, Stewart's observation of her assailant was under the best of conditions.

Second, Stewart's testimony about the confrontation next to her mail cart outside 6533 Drexel indicates her attentiveness. This was no casual occurrence that might easily be forgotten. Indeed, Stewart indicated that she was especially attentive after the confrontation over the bundle.

Third, the description that Stewart gave to the postal agents at the scene of the assault only minutes after it occurred was accurate.[8] Inspector Petschel's notes indicated that she described her assailant as a dark complected black male, approximately five feet seven inches tall, with a heavy build, weighing 178 to 188 pounds, wearing a moderate Afro hairstyle, a dark blue ski hat, black pants and a light colored coat. The lineup photo shows Kimbrough to be a dark black male, with a heavy build and a moderate Afro hairstyle. Also, the color photo shows Kimbrough's height to be approximately five feet eight inches.

Fourth, and perhaps the most important point, is that Stewart displayed a total certainty in the identification of Kimbrough[9] when Inspector Petschel showed Stewart the composite sketch. He asked her if it looked like either of the men that had tried to rob her. She answered affirmatively. Petschel then asked if she was sure and she again responded affirmatively, noting that she recognized the sketch as the shorter, fat man who had assaulted her. Petschel next showed her a black and white photograph of Kimbrough taken in 1968. Stewart unequivocally identified it as a

---

8. Defense counsel attempted to show that Stewart's initial description was inaccurate because she didn't mention a beard. At trial and at the suppression hearing, she testified that she did not recall her assailant as wearing a beard. Defense counsel relied on the lineup picture which shows Kimbrough with a small beard or goatee, to contradict Stewart's testimony. Yet, Inspector Petschel did not recall a beard on Kimbrough. Neither does Kimbrough's witness, William Simpson, who testified that Kimbrough wore no beard on February 20, 1975, though he was in need of a shave. Coincidentally, Stewart also described her assailant as unshaven, rather than bearded. Thus, nothing really favorable to the defendant can be found in Stewart's failure to mention a beard in her original description. Her initial description is an accurate portrayal of Kimbrough.

9. In some cases a witness' certainty of identification may be based on an initial misidentification. Judge Cummings outlined this difficulty recently in *United States v. Bowie*, 515 F.2d 3 (7th Cir. 1975) where he stated:

". . . the risk described by Justice Harlan in *Simmons* is that an initial photographic misidentification, which was the product of improper suggestions, might be perpetuated in any subsequent identification, including that made in court. This is so because a witness might tend to identify the defendant based on his memory of the photograph selected from the first, suggestive display, rather than from actual memory of the event", 515 F.2d at 7–8.

Again due to the overall reliability of Ms. Stewart's identification we do not believe that her identification is based on an initial misidentification.

photograph of the same man who as-. saulted her, but correctly noted that he appeared older now and that he now wore his hair differently. Stewart next viewed a more recent color photograph of Kimbrough, which she positively identified as her assailant.

After Stewart indicated that she was "sure of my identification" a lineup was held.[10] When Stewart entered the well-lit lineup room, the men were facing the wall so that she had only a rear view. Before they turned around, Stewart recognized Kimbrough from the unusual shape of his body. Stewart did have a rear view of her assailant on two occasions during her delivery on the 6500 block. After the man faced her, Stewart also identified Kimbrough's face. She was convinced of her lineup identification. Stewart identified Kimbrough in court as her assailant without any indication of doubt.

The fifth and final indication of reliability is that fact that the photographic identification of Kimbrough took place within one to one and one-half hours after the assault. The lineup was held approximately twenty-four hours later. Thus, it is unlikely that Stewart's memory of her assailant had become so faded that she would identify a man other than her assailant.

Thus, under the "reliability" test of *Neil v. Biggers, supra,* considering the totality of the circumstances, it is evident that Stewart's identification of Kimbrough was not mistaken despite the suggestive nature of the initial identification procedure.

Nearly the same identification problem in this case is found in the Court's recent opinion in *Israel v. Odom,* 521 F.2d 1370 (7th Cir. 1975). The eyewitness and victim of the crime of rape was shown a single composite sketch and later picked the defendant out of a lineup. He was the only one in the lineup wearing glasses and he was considerably shorter than the other participants. The Court found that the pretrial identification procedures were obviously suggestive. However, the Court affirmed· the conviction because the identification was reliable, and therefore there was no deprivation of the defendant's due process rights. Chief Judge Fairchild concluded:

> "the identification procedures employed in this case were suggestive in varying degree, and unnecessarily so. They are not condoned. The constitutional consideration here, however, is not police behavior but rather reliability of identification. While this case is close, we have carefully studied the testimony and conclude that there was no deprivation of due process."

In this case we echo the sentiments of the Chief Judge. Admittedly the procedures employed by the postal inspector were poor law enforcement practice. Yet the reliability of this identification, to the extreme of selecting the defendant from a rear view, is uncanny and beyond question.

By our decision today we do not approve the use of single photo spreads. We still adhere to our decision in *United States v. Cox,* 428 F.2d 683 (7th Cir. 1970) where the Court warned that suppression of the identification might be necessary, stating:

> ". . . dangers inherent in the use of photographic representations are increased when pictures of only a single individual resembling the suspect are viewed. Under certain circumstances, such a 'highly suggestive photographic viewing' may be so improper as to call for suppression of any subsequent identification because of the risks of injustice . . ." 428 F.2d at 686.

## II. THE JURY WAS ADEQUATELY INSTRUCTED ON THE ISSUE OF EYEWITNESS IDENTIFICATION.

■ In the past few years this Court has issued a number of decisions dealing

10. The lineup in this case was conducted properly. A photograph of the lineup is included in the record. We encourage preserving the makeup of the lineup for review by the taking of a photograph of the lineup at the time the witness makes the identification.

with the constitutional problem of protecting a defendant's due process rights while ensuring quick and efficient means of pretrial identification. We have never adopted any form of per se inadmissibility rule [11] where an identification is found to be suggestive.

The court gave an instruction which would have satisfied the requirements of the rule enunciated in *United States v. Hodges*, 515 F.2d 650 (7th Cir. 1975) even if the case had been tried after the decision in *Hodges*. The court, over the objection of the defendant, deleted the last paragraph of the instruction. The instruction as a whole was taken from *United States v. Telfaire*, 152 U.S.App. D.C. 146, 469 F.2d 552, 555 (1972). The paragraph deleted from the instruction states:

> "I again emphasize that the burden of proof on the prosecutor extends to every element of the crime charged, and this specifically included the burden of proving beyond a reasonable doubt the identity of the defendant as the perpetrator of the crime with which he stands charged. If after examining the testimony, you have a reasonable doubt as to the accuracy of the identification, you must find the defendant not guilty."

When this Court decided in *United States v. Hodges, supra*, that an instruction on identification would be required, it did not mandate a specific instruction. Judge Grant stated for the Court that ". . . it is not our intention to require the *Telfaire* model to be given verbatim." The Court only sought to give notice that in future cases it would ". . . view with grave concern the failure to give [the substantial equivalent of the *Telfaire* instruction]".

In this case, which went to the jury only a week or so after the *Hodges* opinion issued, the trial judge gave the jury the substantial equivalent of the *Telfaire*

model instruction. In accordance with the *Hodges* opinion we think it was within the trial judge's discretion to give the *Telfaire* instruction with the last paragraph deleted. The crucial language of the paragraph directs the jury to return a finding of not guilty if they are not convinced beyond a reasonable doubt as to the accuracy of the identification. However, the concept of reasonable doubt was adequately covered in other instructions and repeatedly emphasized in the closing arguments by defense counsel.

## III. THE TRIAL COURT DID NOT ERR IN PERMITTING EVIDENCE OF PRIOR CRIMES.

Over the defendant's objection, the government was allowed to ask Inspector Petschel about prior crimes in which the defendant was involved. Specifically testimony was received about the defendant's use of a white shopping bag in another crime. The testimony about the white bag being used served as a form of personal trademark which obviously reflected poorly on the defendant. Since Kimbrough was charged with assault and previously pled guilty to possession of stolen mail, the defense argues that there is no connection between the two crimes to show a plan or intent. And, further, that the probative value in admitting evidence of prior possession of stolen mail is far outweighed by the prejudice to the defendant's case by the admission of prior crimes.

■ In response the government states that it did not introduce any evidence of prior crimes in its case in chief; and, that the only reason the evidence was presented was to explain Inspector Petschel's reason for suspecting Kimbrough.[12] During defense counsel's examination, many questions were directed to why Inspector Petschel singled out the defendant as a prime suspect. Appar-

---

11. For a review of the Supreme Court's opinions on the subject of a per se rule and Justice (then Judge) Stevens' very cogent argument against adopting such a rule, see *United States ex rel. Kirby v. Sturges*, 510 F.2d 397 (7th Cir. 1975).

12. Inspector Petschel remembered the white shopping bag when Ms. Stewart described the defendant.

ently the defense sought to demonstrate to the jury that Petschel was "out to get" Kimbrough. The trial court ruled that the question had been sufficiently opened up so that the government was entitled to show other identifying factors that were taken into account by Petschel. We believe the ruling was correct.

■ In addition, similar prior acts or crimes are admissible to show the defendant's intent. The statute in this case requires that the government prove an intent to steal from the mails accompanied by an assault on a postal employee. Since the defense had moved for a directed verdict at the close of the government's case this evidence showing intent was a significant issue in the case.[13]

■ The defense contends that any evidence concerning prior crimes was inadmissible because the government violated local discovery Rule 2.04[14] which requires them to turn over to the defense any statements of the defendant in their possession. The only material given to the defense was a two line statement of the defendant taken on February 20, 1975 by Inspector Petschel. Therefore the defense was unaware of statements and confessions the defendant had made previously until the day of trial.

The government admits that in this particular case all that was released to defense counsel was the two line statement. Government counsel assumed, incorrectly, that defense counsel had received the memorialized statements at 2.04 conferences in the previous case against the defendant. This was a legitimate misunderstanding or error on the part of the government counsel. Yet the net result is a violation of the rule.

However, we do not see how any prejudice resulted. Defense counsel had to know prior to trial that Kimbrough had pled guilty to a possession charge in the other case. Furthermore, it is inconceivable that defense counsel had not asked his client the standard question, "What did you already tell the authorities?" But even if the defendant failed to inform his attorney about the admissions, the statements were turned over *prior* to the beginning of the suppression hearing. Therefore the one statement that was introduced into evidence was not presented until two days later. Because there is no evidence of bad faith on the part of the government, and because Kimbrough's defense was not seriously prejudiced we believe that this violation of Rule 2.04 does not amount to reversible error.

Affirmed.

13. The defense argued that the facts of the government's case showed nothing more than a simple assault, consequently there was no intent to steal from the mails. However, the government's case in chief included Stewart's testimony that she had seen the defendant remove a bundle of mail from her cart five minutes before the assault. He replaced it only after Stewart asked him to do so. After the assault Stewart ran from the hallway screaming. Thus one can reasonably conclude that Stewart's challenge to Kimbrough on his first attempt to steal mail coupled with her sudden escape and screams on the second attempt, prevented Kimbrough from stealing the mail.

14. Local Rule of Criminal Procedure 2.04 states:

"(a) Within five (5) days after the arraignment the United States Attorney and the defendant's attorney shall confer and, upon request, the government shall:

(1) Permit defendant's attorney to inspect and copy or photograph any relevant written or recorded statements or confessions made by the defendant, or copies thereof, within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government;

\* \* \* \* \* \*

(b) If, in the judgment of the United States Attorney, it would not be in the interests of justice to make any one or more disclosures set forth in paragraph (a) and requested by defendant's attorney, disclosure may be declined.