In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2448

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

PERCY Z. GILES,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 CR 69--Elaine E. Bucklo, Judge.

Argued February 13, 2001--Decided April 9, 2001

Before MANION, KANNE, and EVANS, Circuit Judges.

EVANS, Circuit Judge.  Percy Z. Giles, a Chicago
alderman for 15 years, appeals his conviction,
after a 2-week jury trial, on 13 counts of
racketeering, mail fraud, extortion, and
understating the income on his federal tax
returns.

In essence, the indictment charged that Giles,
in addition to some minor shenanigans involving
his official expense account, pocketed $10,000 in
cash bribes from a government mole and extorted
an additional $81,000 from a company operating an
illegal dump in his aldermanic ward. The tax
counts, naturally, involve not highlighting this
illegal activity on his tax returns. Giles, who
is serving a 39-month sentence, appeals, raising
questions regarding an important element of
extortion under the Hobbs Act, the sufficiency of
the evidence on some counts, and whether certain
alleged evidentiary errors and instruction
shortcomings require that a new trial be ordered.

Giles was born to a very poor family in rural
Arkansas. To his credit, he got an education,
graduating from the University of Arkansas in
1974. The degree took him to Chicago and into the
management training program at Walgreens.
Eventually he became involved in civic affairs,
including either organizing or joining the "West
Side Business Improvement Association" in

Chicago's 37th aldermanic ward, a group he became the paid executive director of in 1983. That led to politics, and Giles won a special election to the post of 37th ward alderman in 1986. He won reelection to 4-year terms in 1987, 1991, 1995, and 1999, the last despite the fact that he was under the dark cloud of the indictment in this case./1

We first turn to the facts, which we must view in the light most favorable to the jury's verdict. We may reverse Giles' conviction, absent some compelling, prejudicial legal error, only if there is no evidence, regardless of how it is weighed, from which a rational jury could have found the elements of the charged offenses proven beyond a reasonable doubt. United States v. Bond, 231 F.3d 1075 (7th Cir. 2000).

An industrial section of the 37th ward at Division Street and Cicero Avenue contained a 15-acre site belonging to Belt Railway Company. In 1992 Belt began negotiating for the sale of the site to the Niagra Group. While Niagra's offer to purchase was being considered, Giles wrote to Belt, on his official stationary, congratulating the company on the sale because Niagra's proposed development would be beneficial to the citizens of the ward. But, instead of developing the site, Niagra used it as a dump for construction debris, causing complaints from other businesses, especially Helene Curtis (now Unilever), a neighboring company located next door. Complaints about the situation fell on Giles' deaf ears even when dumping eventually caused the grade of the site to be 40 feet above the Helene Curtis parking lot, compelling Helene Curtis to spend $290,000 for a drainage system. Neighborhood meetings were held regarding the site at which Peter Valessares, a long-time friend of Giles, continued to assert that Niagra planned to develop the site into an industrial park. This dumping-and-false-promises routine went on for a number of years.

In 1992 Niagra was ticketed by an inspector for Chicago's Department of the Environment for operating a dump without a permit. Giles prevailed upon the commissioner of the environment to drop the ticket. He did. The dumping continued. The Department of Zoning issued a notice of violation because the site was zoned for manufacturing, not dumping. Giles intervened in these matters as well. At a May 1994 meeting attended by Giles, representatives of Niagra, of businesses neighboring the site, and of several city departments, Giles stated that Niagra would get the site cleaned up and was on the verge of getting its proposed development started. The head of the building department was

skeptical, saying that Niagra had done nothing it had promised to do so far to clean up the site. By September 1994 the planning department recommended denying a special use permit for Niagra because the debris at the site exceeded 30 feet above grade, the limit for a landfill. But, with Giles' help, the site remained unchanged as late as 1999.

James Blassingame was a political consultant who worked on Giles' campaigns and served as president of the 37th Ward Regular Democratic Organization. He also served on an organization Giles founded--the 37th Ward Trust Fund. Another organization formed for "charitable" purposes was the 37th Ward Improvement Fund.

In 1992, shortly after the Belt sale to Niagra, Blassingame talked with Giles about Niagra. Giles said Niagra was going to contribute $5,000 to the ward's Trust Fund and that his son, who was in college, had a summer job with Niagra that paid $3,470 for June through August. All in all, from May 1992 through October 1994, various Niagra-related entities wrote checks totaling $81,200 to the two 37th ward organizations under Giles' control.

Giles also had dealings with John Christopher, a corrupt contractor and paid informant to the Federal Bureau of Investigation, who taped a number of meetings with Giles and Blassingame. And a word about Christopher is appropriate. As Giles' very capable counsel, Walter Jones, put it, he's a scoundrel. We might add that he appears to be a notorious con man and a professional manipulator. But he's the person the FBI used to get to alderman Giles, and we'll have to leave the judgment on whether that's kosher to others. At any rate, Giles did business with Christopher, and as the trial judge said at sentencing, "If you lie down with dogs, you will get fleas."

Christopher, wired and working undercover with the FBI, professed to Giles an interest in getting a contract for his construction company, Teka, to work on a shopping mall to be built in the 37th ward. During the taped conversation, Giles said that he had honored his deal with Niagra: "I have put my ass out on the chopping block for them."

As the election of 1995 approached, Giles talked to Blassingame about raising $10,000 for the campaign. Giles told him to call Christopher about raising the money. Christopher said he could do it. In turn, he wanted help getting work for Teka on the proposed shopping mall. After making sure that Teka could not be traced to

Christopher because it was in someone else's name and appeared to be a minority-owned business, Giles agreed to help for "ten." But, he said, there should be no check that would show "on the sheets" as a campaign contribution. Later, in a rear, private area of Edna's restaurant, a soul food diner on Chicago's west side, Christopher handed Giles an envelope containing $5,000 in cash. When interviewed by the FBI, Giles denied ever receiving cash of any kind from Christopher and, in fact, said that the largest cash contribution he received was $500. To the State Board of Elections, Giles said that neither he nor his organizations had raised more than $1,000 in a 12-month period.

The indictment also contained certain aldermanic voucher allegations involving the expense account provided to aldermen. The account, which was over $20,000 per year, was to be used for expenses incurred in the performance of official duties, including parking fees, gasoline, insurance, repair and maintenance of a motor vehicle, but not for personal, political, or campaign-related expenses. To access the account, an alderman submits a direct payment voucher to the city comptroller's office. It describes the expense and identifies the vendor to whom payment should be made. Giles submitted vouchers for expenses for his own car, which he used on city business, but also expenses for his wife's Volvo. In November 1995 he submitted vouchers for $1,440 in parking tickets going back to 1988, issued to three different cars, including his wife's.

In 1993 Giles submitted a $1,500 voucher for "public service paid by an alderman's office." The actual vendor was the Patrick Media Group, a billboard company. The billboards were to announce the opening of a new store in the ward. Giles rented two billboards at a public service discount rate of $750 each. He paid the $1,500 with a check drawn on the 37th Ward Trust Fund account and was reimbursed by Goldblatt's with a check to the 37th Ward Improvement Fund. Despite the Goldblatt's payment, Giles submitted a voucher to the city for the billboards, listing the 37th Ward Regular Democratic Organization as the vendor.

Giles also submitted a voucher for $4,977 for catering expenses for needy families. The vendor was Mac's Plus, which was not, in fact, a caterer but a record store, owned by a friend of his who had loaned Giles $2,600 to sponsor a Thanksgiving turkey giveaway. Giles repaid Mac's Plus with a money order. Three days after the $4,977 voucher was submitted for Mac's Plus, the FBI came calling, and the next day after that, the voucher was cancelled, but it was too late as the check

had already been cut. Giles' administrative assistant went to the comptroller's office and retrieved the supporting documents which had been attached to the voucher.

The tax counts, as we mentioned, charged Giles with making false statements about his income in 1994 and 1995--not claiming as income the expense account money used for personal expenses and not claiming money contributed to ward organizations that went to personal use (his son's college tuition, a home improvement loan, etc.).

The racketeering count in the indictment involves the Division Street site operated by Niagra; the allegations include extortion and bribery. The core of Giles' contentions is that to prove extortion the government must show that Niagra made payments in exchange for a quid pro quo--a specific promise to perform or not perform an official act. It is the alleged failure to prove a quid pro quo that Giles claims requires a judgment of acquittal on the Rule 29 motion he filed after the trial. He also claims that the jury was not properly instructed regarding the necessity of a quid pro quo.

Extortion is defined in the Hobbs Act, 18 U.S.C. sec. 1951, as the "obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right," and this is an "under color of official right" case. In such a case, it is well-established after McCormick v. United States, 500 U.S. 257 (1991), that in order to obtain a Hobbs Act conviction based on an official's acceptance of campaign contributions, the government must show that the "payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." Id. at 273. See also United States v. Allen, 10 F.3d 405 (7th Cir. 1993). The Court explicitly stated that its holding in McCormick did not apply to payments made to nonelected officials or payments made to elected officials but which are determined not to be campaign contributions.

Because the bulk of the payments Niagra made to Giles were not campaign contributions, the issue before us is whether an extortion conviction under the Hobbs Act requires that payments which are made "under color of official right" but which are not campaign contributions must also be shown to have been paid in exchange for a specific promise to perform an official act. Giles argues that the district judge mistakenly interpreted Evans v. United States, 504 U.S. 255 (1992), when she concluded that the quid pro quo requirement applies only to cases where the

suspect funds are campaign contributions. Giles says that Evans extends the requirement for a quid pro quo to cases which do not involve campaign contributions. On the other hand, the government contends that it doesn't matter in Giles' case because there was evidence to support the existence of a quid pro quo. Furthermore, according to the government, the instructions, in fact, informed the jury that a quid pro quo was required.

Evans involved both campaign contributions and other payments. The issue was whether a public official must have taken an affirmative act of inducing the payment-- whether he must have taken the initiative. The Court decided that the official need not have been the initiator:

We hold today that the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts.

At 268. The statement can be read to imply that all illegal payments must involve a promise that the official will take a specific action. Justice Kennedy read the majority opinion as a clear indication that the quid pro quo requirement set out in McCormick applied to all Hobbs Act prosecutions:

Readers of today's opinion should have little difficulty in understanding that the rationale underlying the Court's holding applies not only in campaign contribution cases, but in all sec. 1951 prosecutions. That is as it should be, for, given a corrupt motive, the quid pro quo, as I have said, is the essence of the offense.

At 278. The dissenters, Justice Thomas joined by Chief Justice Rehnquist and Justice Scalia, also read the opinion as requiring a quid pro quo in all cases, but they were somewhat less happy about the requirement, saying "[t]his quid pro quo requirement is simply made up." At 286.

Although not all courts of appeals that have considered the issue have found the Evans holding entirely clear, see United States v. Blandford, 33 F.3d 685 (6th Cir. 1994), several have determined that the quid pro quo requirement does, in fact, apply to all Hobbs Act extortion prosecutions. See, e.g., United States v. Collins, 78 F.3d 1021 (6th Cir. 1996); United States v. Hairston, 46 F.3d 361 (4th Cir. 1995); United States v. Martinez, 14 F.3d 543 (11th Cir. 1994); United States v. Garcia, 992 F.2d 409 (2nd Cir. 1993). The Court of Appeals for the Ninth Circuit deftly sidestepped the issue by not quite actually saying that a quid pro quo is required

but finding that

even applying the quid pro quo requirement to non-campaign contributions, and viewing the evidence in the light most favorable to the government, there is more than sufficient evidence of a quid pro quo to support the extortion convictions here.

United States v. Tucker, 133 F.3d 1208, 1215 (1998).

We are not convinced that Evans clearly settles the question. And we recognize a policy concern which might justify distinguishing campaign contributions from other payments. After all, campaign contributions often are made with the hope that the recipient, if elected, will further interests with which the contributor agrees; there is nothing illegal about such contributions. To distinguish legal from illegal campaign contributions, it makes sense to require the government to prove that a particular contribution was made in exchange for an explicit promise or undertaking by the official. Other payments to officials are not clothed with the same degree of respectability as ordinary campaign contributions. For that reason, perhaps it should be easier to prove that those payments are in violation of the law.

However, it is our view that this policy concern is outweighed by language in Evans, which, although not entirely clear, can easily be read to lend support to an inference that the quid pro quo requirement applies in all extortion prosecutions under the Hobbs Act--not to mention that four of the Justices read the language to include the requirement. We therefore join the circuits that require a quid pro quo showing in all cases. That said, we also agree with the Ninth Circuit in Tucker that the government need not show an explicit agreement, but only that the payment was made in return for official acts-- that the public official understood that as a result of the payment he was expected to exercise particular kinds of influence on behalf of the payor. The Court stated in Evans:

The official and the payor need not state the quid pro quo in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods. The inducement from the official is criminal if it is express or if it is implied from his words and actions, so long as he intends it to be so and the payor so interprets it.

At 274.

Unfortunately for Giles, he wins the battle but

loses the war. His case was actually tried, we think, as a quid pro quo case. The district judge found that the evidence supported a finding that a quid pro quo existed. She said that Giles

argues that evidence of extortion was circumstantial and no witness testified that Mr. Giles expressly agreed to do Niagra favors in exchange for money. But a reasonable jury might have concluded that he did from the circumstantial evidence presented. This included his taking more that $81,000 from Niagra while intervening with the city to help its Division Street dump, and his taped statements that he had a "deal' with Niagra, as well as Niagra's hiring his son.

Giles began promoting Niagra's interests with his May 5, 1992, letter to Belt Railway; 2 weeks later, on May 19, 1992, a Niagra division wrote a $5,000 check to the Trust Fund. In July 1992 Giles met with the commissioner of the environment to persuade him not to enforce a ticket issued to Niagra; on July 7, 1992, a $6,000 check was paid to the Regular Democratic Organization. On December 18, 1992, Niagra was issued another ticket, and the same day a $4,000 check went to the Improvement Fund. In 1993 and 1994 Giles pushed for the zoning variance and stalled enforcement of the environmental and zoning ordinances. During that time Niagra's payments totaled $47,500. Giles repeatedly told city regulators that Niagra intended to clean up the site and build an industrial park on it--even displaying an artist's rendering of what the development would look like. But nothing happened. Also, the tapes confirm what was going on. A rational jury could determine that payments were made in return for official acts.

Giles objects to the extortion jury instructions as not informing the jury of the quid pro quo requirement and, of course, he's right as those words of art were not mentioned. But although the magic words quid pro quo were not uttered, a simplified version of the concept, the idea that "you get something and you give something," was. The instructions stated that an official commits extortion when he

obtains money or property to which he is not entitled, knowing or believing that the money or property is being, or would be given, to him in return for the taking, withholding or other influencing of official action.

Extortion requires a "specific exercise of his official power." Another instruction says,

if a public official conspires to obtain, or

attempts to obtain, or obtains money or property, knowing or believing that it is or would be given in exchange for a specific requested exercise of his official power, he has committed extortion . . . .

These instructions, we find, sufficiently inform the jury that the payments must be made with the expectation that a specific official act will be taken. And so, the concept of quid pro quo was adequately presented to the jury.

Next, Giles contends that the evidence is not sufficient to support the mail fraud convictions. To obtain a conviction for mail fraud, the government must show that the defendant acted with intent to defraud. He must act with the specific intent to deceive or cheat the victim, either for financial gain or to cause financial loss. The scheme must be reasonably calculated to deceive persons of ordinary prudence. United States v. Paneras, 222 F.3d 406 (7th Cir. 2000).

Giles argues that his vouchers were not fraudulent. He could have been using his wife's car on official business. He might not have intended to deceive. However, the government notes that he submitted vouchers for 3 years for insurance on his wife's car; and also submitted vouchers on lease payments, insurance, and maintenance for his Chrysler. The payment for the Goldblatt's billboards involved submitting a voucher for an expense Giles had already been compensated for. The route the payments took-- paying $1,500 out of the Trust Fund to Patrick Media, getting $1,500 back to the Improvement Fund from Goldblatt's, and naming the RDO as the vendor on the voucher--allows an inference that the conduct was intentional. In addition, the Mac's Plus payment, even though it was not charged in the indictment, also supports the verdict.

Giles' final contention is that the district court committed evidentiary errors which require a retrial. We review evidentiary decisions for an abuse of discretion. United States v. Wesela, 223 F.3d 656 (7th Cir. 2000); cert. denied, ___ S. Ct. ___ (February 20, 2001). Although at first glance it is easy to see why Giles thinks the rulings unfair, we find that they comply with the Rules of Evidence and do not constitute an abuse of discretion.

A number of taped conversations between Giles and informant Christopher were admitted to support the government's case. However, a tape from February 11, 1995, which Giles said was exculpatory, was excluded. Giles argues that it should have been admissible under Rule 803(3) of

the Federal Rules of Evidence to show his then-existing mental state. He also says that it was admissible under Rule 106, the rule of completeness. The judge disagreed and ruled that the tape was hearsay and not admissible to show his mental state because the crime was complete when Giles took the first payment on January 20. The 3-week interval between the two taped conversations, said the judge, left too much time for reflection and fabrication by Giles. The completeness argument was rejected for much the same reason, and also the statements were seen as self-serving and lacking in circumstantial guarantees of trustworthiness under the catch-all provision in Rule 807.

We think the February 11 tape should have been admitted, especially in this case where Giles was going to (and did) testify. The government's argument that the tape was a product of Giles' reflection--an attempt to cover his tracks in case he got caught--should have been made to the jury, not the judge. On a close evidentiary call like this, we think it's best to err on the side of inclusion rather than exclusion if an error at all is to be made. But all that said, we can't say the decision to keep the tape out was so outside the zone of reasonableness so as to be an abuse of discretion by the trial judge. And even if it were, unfortunately for Giles, given the strong evidence of his guilt, the error would be viewed as harmless.

In a related issue, Giles wanted to call Christopher, who is in the federal witness protection program, as a trial witness (the government didn't put him on, as the taped conversations came in through Blassingame) and question him about whether the government scripted his conversations with Giles. But it seems clear here that the true defense reason (and we can understand the desire to do it) for wanting to put Christopher on the stand was to expose his warts to the jury and float the inference that the FBI should not play footsie with a sleazeball. But because it's clear that a party may not call a witness for the sole purpose of impeaching him, United States v. Webster, 734 F.2d 1191 (7th Cir. 1984), and further because no offer of proof was presented as to the substance of the testimony Giles believed in good faith Christopher would give, we again can find no clear abuse of the trial judge's discretion to prevent the defense from putting Christopher on the stand.

For these reasons, the judgment of the district court is AFFIRMED.

/1 In the old days, an indictment charging 13 felonies would have been the kiss of death for a politician. Apparently that is no longer the case.