In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-1390

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RONALD KIELAR,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:10-cr-00691-1 — **Robert M. Dow, Jr.,** *Judge.*

ARGUED DECEMBER 4, 2014 — DECIDED JUNE 29, 2015

Before BAUER, RIPPLE, and SYKES, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Ronald Kielar was convicted in the
United States District Court for the Northern District of Illinois on charges arising out of a scheme to defraud two
health insurance companies by submitting fraudulent claims
for the prescription drug Procrit. He now appeals his conviction, alleging several procedural and evidentiary errors. For
the reasons set forth in this opinion, we affirm the judgment
of the district court.

## I

## BACKGROUND

Ronald Kielar was a licensed pharmacist at the Cartagena Pharmacy in Chicago, Illinois. Many of Mr. Kielar's patients came from the medical practice of Dr. Camilo Barros, whose office was located in the same building as the Cartegena Pharmacy. Starting in November 2004, Mr. Kielar began defrauding two health insurance companies, Blue Cross and Blue Shield of Illinois ("BCBS") and United Food and Commercial Workers Union and Employers Midwest Health Benefit Fund ("UFCW"), by submitting fraudulent claims for the prescription drug Procrit.[1] In particular, Mr. Kielar forged prescriptions for Procrit under Dr. Barros's name and then submitted those prescriptions to BCBS and UFCW for payment. He knew at the time that Procrit had neither been prescribed, nor provided, to any of the individuals under whose policies he sought reimbursement. His scheme continued over roughly six years and resulted in losses to BCBS and UFCW of approximately $1,678,549.

In August 2010, Mr. Kielar was indicted on five counts of health care fraud in violation of 18 U.S.C. § 1347. This indictment also contained a forfeiture allegation, pursuant to 18 U.S.C. § 982(a)(7), for any proceeds of Mr. Kielar's fraudulent scheme. This allegation specifically identified three of Mr. Kielar's properties as subject to forfeiture, including a property located at 12786 NW 75th Street, Parkland, Florida (the "Florida Property").

---

[1] Procrit is an intravenous drug used to treat patients suffering from chronic kidney failure, cancer, or HIV infection.

Later that month, the Government filed a notice of lis pendens for the Florida Property based on the indictment's forfeiture allegation. Shortly thereafter, Mr. Kielar filed a motion requesting permission to sell the Florida Property, stating that he needed the proceeds of the sale in order to pay his attorneys' legal fees. In its response, the Government stated that it did not object to the sale, provided that Mr. Kielar deposit the sale proceeds in an escrow account with the United States Marshals Service.

In October 2010, the district court granted Mr. Kielar's motion to release the lis pendens and allow for the sale of his Florida Property. Consistent with the Government's request, however, the court ordered that the proceeds of the sale be placed in an escrow account with the United States Marshals Service. Shortly after doing so, Mr. Kielar filed another motion asking the district court to vacate its earlier order and allow him to use the sale proceeds "for taxes, legal fees and other expenses."[2] After several rounds of briefing, the district court denied Mr. Kielar's request and, shortly thereafter, also denied his motion for reconsideration.

In March 2013, a grand jury returned a ten-count superseding indictment against Mr. Kielar, charging him with six counts of health care fraud, in violation of 18 U.S.C. § 1347; three counts of aggravated identify theft, in violation of 18 U.S.C. § 1028A(a)(1); and one count of using false records to impede a federal investigation, in violation of 18 U.S.C. § 1519. Like the initial indictment, the superseding indictment also contained a forfeiture allegation pursuant to 18 U.S.C. § 982(a)(7).

---

[2] R.36 at 2.

Following a week-long jury trial, Mr. Kielar was convicted on all charges.[3] He timely appealed.[4]

## II

## DISCUSSION

Mr. Kielar contends that the district court erred on three separate grounds: (1) by failing to hold an evidentiary hearing on his request to release his escrowed funds, (2) by limiting his cross-examination of Dr. Barros, a key government witness, and (3) by preventing him from calling Fernando Perez as a defense witness. We address these issues in turn.

### A.

We begin with Mr. Kielar's contention that the district court erred by failing to hold an evidentiary hearing on his request to release his escrowed funds. Because this contention concerns the scope of Mr. Kielar's rights under the Due Process Clause, our review is de novo. *United States v. Kirschenbaum*, 156 F.3d 784, 792 (7th Cir. 1998).

### 1.

Mr. Kielar first requested that the district court release his escrowed funds in November 2010, shortly after the sale of his Florida Property. In particular, Mr. Kielar filed a motion asserting that the restraint on his access to those funds

---

[3] The district court's jurisdiction was premised on 18 U.S.C. § 3231.

[4] Our jurisdiction over this appeal is secure under 28 U.S.C. § 1291.

impeded his ability to pay his attorneys' legal fees in violation of his Sixth Amendment right to counsel. Notably, this motion contained neither documentary evidence nor specific factual allegations demonstrating Mr. Kielar's need for the sale proceeds to finance his defense.

The Government opposed the motion. It submitted that the restraint on Mr. Kielar's assets did not violate his Sixth Amendment right to counsel because he had not shown, "beyond the conclusory statements in his reply," a "bona fide need" for the assets.[5] The Government's brief also explained how it could trace the proceeds of Mr. Kielar's fraudulent scheme from the corporate bank account of the Cartegena Pharmacy to mortgage payments on the Florida Property.

In December 2010, the district court held a status hearing at which defense counsel stated that Mr. Kielar's motion "may require a more detailed hearing."[6] Counsel then requested that the district court allow for additional briefing on the issue. The district court granted the request.

In January 2011, Mr. Kielar submitted a brief in support of his November 2010 motion. Although the brief contained several legal arguments, the only allegations in the brief concerning Mr. Kielar's need for the funds to pay his legal fees were as follows:

> Over the past four and a half months, Defendant Kielar has fallen behind in payments to his attorneys and is now in arrears for a sub-

---

[5] R.40 at 4.

[6] R.168 at 4.

> stantial sum. Defendant Kielar's inability to pay is due to the forfeiture clause which the Government included in the Indictment.…
>
> ….
>
> …Defendant Kielar has demonstrated a bona fide need for those funds because his attorneys can no longer afford to represent him on an essentially pro bono basis. Defendant Kielar's counsel has invested immense time and substantial money in his defense. To prevent the release of funds in escrow to Defendant Kielar's attorneys would be to force them to withdraw from this case. As such, the court is essentially depriving Defendant Kielar of his *Sixth Amendment* right to the counsel of his choice and such a deprivation cannot stand. This Court must allow the release of sale proceeds from the Florida Property in order to allow the defendant to continue to retain his chosen counsel.[7]

Mr. Kieler did not submit any documentary evidence to substantiate these claims.

In response, the Government again submitted that Mr. Kielar's motion should be denied because he had failed to demonstrate a bona fide need for the assets at issue. The Government further asserted that, assuming that Mr. Kielar had shown a bona fide need, it had already demonstrated adequately the basis for its forfeiture allegation.

---

[7] R.42 at 2, 4 (emphasis in original).

In reply, Mr. Kielar submitted a one-and-a-half-page affidavit in which he swore to the following facts: (1) that the combined pharmacy salaries for him and his ex-wife (with whom he lived) were only enough to pay minimal living expenses, (2) that he derived the down payment for the Florida Property from refinancing his house in Illinois, which was purchased in 1999, (3) that he owned a 2002 automobile with 200,000 miles, (4) that he owned two Met Life insurance policies with limited equity, and (5) that he was unable to pay his attorneys' fees without the release of funds. Mr. Kielar did not submit any further documentary evidence to substantiate these assertions.

In February 2011, the district court denied Mr. Kielar's request to release the proceeds from the sale of his Florida Property. In doing so, the district court relied on our decision in *United States v. Moya-Gomez*, 860 F.2d 706 (7th Cir. 1988), as setting forth the relevant legal standard for assessing Mr. Kielar's claim:

> [A] defendant whose assets may be subject to forfeiture may make out a Sixth Amendment right-to-counsel claim only if (1) he can establish "a *bona fide* need to utilize assets subject to the restraining order to conduct his defense" and (2) the Government fails to "demonstrate the basis for its assertion, contained in the indictment, that the assets are subject to forfeiture."[8]

---

[8] R.46 at 2 (quoting *United States v. Moya-Gomez*, 860 F.2d 706, 730 (7th Cir. 1988).

With regard to the first prong of this test, the district court noted that the only evidence of a bona fide need submitted by Mr. Kielar was his one-and-a-half-page affidavit. Although the court acknowledged that this "affidavit lack[ed] detail and [was] not supported by any additional materials (*e.g.*, bank statements, pay stubs, *etc.*) that might make a more convincing showing of need," it nonetheless "assume[d], without deciding, that Defendant [had] shown a *bona fide* need for the restrained assets to support his defense."[9] From there, the court went on to conclude that the Government had offered sufficient evidence to show that the seized assets at issue were subject to forfeiture and, accordingly, that Mr. Kielar was not entitled to the release of his escrowed funds. In a footnote to this discussion, the court noted that Mr. Kielar had "not requested a formal evidentiary hearing on this issue," yet concluded that such a hearing was unnecessary given that Mr. Kielar had been afforded "ample opportunity to present argument (in four briefs) and evidence (in the form of his affidavit)."[10]

At a subsequent status hearing, Mr. Kieler requested that the district court reconsider its February 2011 order. The district court agreed to do so and suggested additional briefing. Shortly afterward, Mr. Kielar filed a written motion for reconsideration. However, he still did not submit any further evidence to substantiate his need for the escrowed funds to finance his defense, nor did he request an evidentiary hearing on the issue. Notably, however, his motion did state that he, as the defendant, did "not bear the burden to request a

---

[9] *Id.* at 3.

[10] *Id.* at 4 n.1.

formal evidentiary hearing on this issue as the court [previously had] indicate[d]."[11]

In May 2011, the district court again denied Mr. Kielar's request to release his escrowed funds. Once again, the court assumed without deciding that Mr. Kielar had established a bona fide need for the assets at issue. Turning to the second step of the *Moya-Gomez* analysis, the court determined that the Government adequately had demonstrated the factual basis for its forfeiture assertion and that "[a]t no time in any of the written submissions or hearings before the Court…ha[d the] Defendant come forward either with argument or evidence to rebut the Government's contentions."[12] Further, the court again noted that Mr. Kielar had not "at any time, including at the most recent status hearing…, requested an evidentiary hearing to challenge the Government's analysis or develop the factual basis for a counterargument."[13]

At a subsequent status hearing, defense counsel asserted that the district court's order "le[ft] open a couple of questions" including "whether [Mr. Kielar] would be seeking an evidentiary hearing."[14] In response, the district court noted that Mr. Kielar had neither previously requested a hearing nor offered any argument or evidence to dispute the Government's showing of traceability. This being the case, the court asked what would happen at a hearing beyond the

---

[11] R.52 at 3.

[12] R.55 at 2.

[13] *Id.*

[14] R.165 at 3.

Government's simply presenting the same evidence that it already had provided in its briefs. Defense counsel initially responded that if an evidentiary hearing were held, Mr. Kielar would not present any evidence because it was not his burden to do so. Defense counsel then acknowledged that he and Mr. Kielar had not yet decided how to pursue this issue and therefore asked for "some time to go over this with Mr. Kielar."[15] The district court granted this request and gave defense counsel thirty days to confer with his client.

At the next status hearing on July 8, 2011, defense counsel stated that he had conferred with Mr. Kielar and that they would "not be asking for an evidentiary hearing concerning the funds."[16]

**2.**

Mr. Kielar now contends that the district court erred by failing to order, sua sponte, an evidentiary hearing on his request to release his escrowed funds. Specifically, he contends that the court's failure to do so "violated his Fifth Amendment due process rights by depriving [him of] his liberty interest under the Sixth Amendment to obtain counsel of his choice."[17]

With regard to certain federal criminal offenses, including the health care fraud offense at issue here, a district

---

[15] *Id.* at 11.

[16] R.166 at 2.

[17] Appellant's Br. 12.

court, upon the filing of an indictment containing a forfeiture allegation, may enter a protective order to preserve the availability of a defendant's assets that are subject to forfeiture. *See* 18 U.S.C. § 982(a)(7), (b)(1); 21 U.S.C. § 853(e)(1)(A). In *Moya-Gomez*, 860 F.2d at 730, we held that a defendant in such circumstances has a limited due process right to contest the Government's forfeiture allegation if the pretrial seizure of his assets would prevent him from hiring the counsel of his choice. In particular, *Moya-Gomez* held that if "the defendant presents a bona fide need to utilize assets subject to the restraining order to conduct his defense" and "the district court finds that the defendant does not have other assets from which such payments can be made," the court "then must require the government to demonstrate the basis for its assertion, contained in the indictment, that the assets are subject to forfeiture." *Id.* With regard to the specific process that was due, we held that such a defendant was entitled to "an immediate, postrestraint, adversary hearing" upon making the requisite showing of bona fide need. *Id.* at 731. In subsequent cases, we have clarified that in order to demonstrate a "bona fide need" a defendant must do more than "submit[] a bare-bones affidavit asserting that he personally lack[s] sufficient funds to obtain counsel of his choice." *Kirschenbaum*, 156 F.3d at 792.

The Government submits that Mr. Kielar waived his right to a hearing under *Moya-Gomez* when, on July 8, 2011, his counsel informed the district court that Mr. Kielar would "not be asking for an evidentiary hearing concerning the funds."[18] Further, the Government contends that, waiver

---

[18] R.166 at 2.

aside, Mr. Kielar was not entitled to an evidentiary hearing because he never presented sufficient evidence to establish a bona fide need for the assets at issue.

The Government's assertion of waiver is correct. Indeed, the waiver here hardly could have been clearer. After having thirty days to confer with his counsel over whether to request an evidentiary hearing, Mr. Kielar *expressly* declined to request one. The record contains, moreover, no indication that this decision was not a knowing and voluntary one. Nor does Mr. Kielar contend otherwise. This decision thus falls squarely within the definition of waiver: it was "the intentional relinquishment of a known right." *United States v. Rodriguez-Gomez*, 608 F.3d 969, 972 (7th Cir. 2010).

Mr. Kielar now attempts to avoid this conclusion by asserting that the hearing right described in *Moya-Gomez* is mandatory and nonwaivable. In his view, any time a criminal defendant is entitled to an evidentiary hearing under *Moya-Gomez*, the district court *must* hold such a hearing on its own initiative even in the absence of a request from the defendant. Mr. Kielar offers no reason why any value protected by the Due Process Clause would require a mandatory hearing in this context. Rather, he merely contends that our decision in *Moya-Gomez* mandates this result.

This argument is without merit. The defendant in *Moya-Gomez* specifically requested a pretrial evidentiary hearing. *See* 860 F.2d at 717. Nowhere in our opinion did we state or suggest that the due process right that we acknowledged was immune from the ordinary rules of waiver. "Constitutional rights like other rights can be waived, provided that the waiver is knowing and intelligent, as it was here." *United*

*States v. Barnett*, 415 F.3d 690, 691 (7th Cir. 2005). We there-fore consider the issue waived.

Even if this objection had been preserved, Mr. Kielar has not presented sufficient evidence to demonstrate a bona fide need for the assets at issue. He has offered no documentary evidence, other than an unsubstantiated affidavit, to demon-strate that the restrained assets were needed to conduct his defense. In *Moya-Gomez*, we stressed that the right to a hear-ing was "very limited" and required as a prerequisite that "the district court find[] that the defendant does not have other assets from which" he could pay for his defense. 860 F.2d at 730. Mr. Kielar's one-and-a-half-page affidavit does not provide enough information, much less enough reliable information, to allow the district court to make this finding. *See Kirschenbaum*, 156 F.3d at 792. Accordingly, even if we were to presume that Mr. Kielar had preserved this objec-tion, he still would not have been entitled to an evidentiary hearing.[19]

---

[19] In his opening brief, Mr. Kielar offers a secondary argument concern-ing his right to a post-indictment hearing on the pretrial restraint of his assets. He contends that, regardless of his right to counsel of choice, he nonetheless has a "general right" to a post-indictment, pretrial hearing before being deprived of his property.

This issue need not detain us long. Because Mr. Kielar did not raise this issue before the district court, our review is for plain error. *See Unit-ed States v. Borostowski*, 775 F.3d 851, 865 (7th Cir. 2014). "An error is plain if it is clear or obvious." *Id.* Here, Mr. Kielar has acknowledged that whether the Due Process Clause requires a hearing in this context is an "open question." Appellant's Br. 18 (internal quotation marks omitted). Because any error, therefore, was not obvious, the plain error standard has not been met. *See Borostowski*, 775 F.3d at 865.

**B.**

We turn now to Mr. Kielar's contention that the district court impermissibly limited his cross-examination of Dr. Barros.

**1.**

Dr. Barros was one of the Government's key witnesses at trial. Prior to trial, the Government had produced records showing that the Illinois Department of Public Aid ("IDPA") had recommended that Dr. Barros be terminated from participating in IDPA's Medical Assistance Program, which consisted of Medicaid and other associated programs. Among the reasons cited for Dr. Barros's termination were that he (1) had failed to obtain and document adequately patient histories and physical examinations and (2) had prescribed medications without appropriate indications.

In July 2013, the Government filed a motion in limine in which it sought two limitations on the cross-examination of Dr. Barros. First, it wanted to restrict any examination concerning his termination from the IDPA program to the sole ground of his recordkeeping. Second, it requested that cross-examination on Dr. Barros's recordkeeping be permitted only if the Government sought to introduce his records. In the Government's view, the other grounds for Dr. Barros's termination were not probative of his character for truthfulness but rather only went to his qualifications and competency as a physician. In response, Mr. Kielar submitted that he should be able to cross-examine Dr. Barros about all of the grounds for termination from these programs because the infor-

mation was "relevant to show bias and self-interest in falsely testifying that he did not prescribe Procrit in this case."[20]

The district court denied in part and granted in part the Government's motion in limine. It precluded the introduction of extrinsic evidence if that evidence was intended solely to impeach Dr. Barros with regard to his character for truthfulness. The court, however, "decline[d] to categorically bar any cross-examination of [Dr. Barros] concerning the IDPA recommendations," noting that some of Mr. Kielar's "proposed lines of cross-examination may demonstrate bias or self-interest on the part of [Dr. Barros]."[21]

On the first day of trial, the Government and defense counsel informed the district court that they had "worked out a solution" in which Dr. Barros would "testify that he was terminated from Medicare and Medicaid in the early 2000–2001 time period" "and then that [would] be the end of the issue as far as defense counsel and the government [were] concerned."[22]

When asked by the district court whether this compromise would "essentially substitute" for any use of the IDPA recommendation to impeach Dr. Barros, defense counsel responded, "We believe it will, Judge."[23]

On direct examination, Dr. Barros testified that he had never written a prescription for Procrit and that all of the

---

[20] R.100 at 6.

[21] R.107 at 5–6.

[22] R.151 at 2.

[23] *Id.* at 3.

prescriptions submitted under his name to BCBS and UFCW contained forged signatures. He further testified that he was terminated as a provider by Medicaid in 2000 and Medicare in 2001.

On cross-examination, defense counsel asked Dr. Barros a series of questions about these terminations. At that point, the Government objected. At a sidebar, it stated its understanding that defense counsel had agreed not to cross-examine Dr. Barros on this topic. Defense counsel replied that he had "never agreed not to ask any questions on this issue."[24] The court then inquired whether this was defense counsel's last question on the topic. Counsel responded that all he wanted to do was to clarify the dates when Dr. Barros was terminated from Medicaid as opposed to Medicare because he believed that the doctor had confused those dates during his direct testimony. The court then stated, "How about one last question, all it would establish is that as of 2001 he could no longer submit whatever it is, Medicare to the state or Medicaid to the federal or whatever the right way to go and just tie up and then move on. Fair enough?"[25]

Defense counsel did not object to this proposed solution. Upon resuming his cross-examination, defense counsel clarified the correct dates of Dr. Barros's termination and moved on to another line of questioning.

---

[24] R.153 at 29.

[25] *Id.* at 30.

**2.**

Mr. Kielar now contends that, by limiting his cross-examination of Dr. Barros, the district court violated both Federal Rule of Evidence Rule 608(b) as well as his right to confrontation guaranteed by the Sixth Amendment. He contends that the district court should not have prevented him from further inquiring about the doctor's termination from Medicare and Medicaid. In his view, further inquiry into the circumstances of the doctor's termination was necessary to show that Dr. Barros had a motive to "falsely testify[] that he did not prescribe Procrit," so as to "maintain[] his medical license" and "regain[] eligibility for Medicaid."[26]

Before proceeding to the merits of Mr. Kielar's argument, we first must address the Government's contention that Mr. Kielar waived, or at least forfeited, this objection by failing to raise it before the district court. "Waiver is the intentional relinquishment of a known right, whereas forfeiture is the failure to timely assert a right." *Rodriguez-Gomez*, 608 F.3d at 972. "Forfeited errors may still be reviewed for plain error, while waived errors are extinguished and cannot be reviewed on appeal." *United States v. Berg*, 714 F.3d 490, 494 n.1 (7th Cir. 2013) (alterations omitted) (internal quotation marks omitted).

Here, the Government first points out that, other than precluding the admission of extrinsic impeachment evidence against Dr. Barros (which Mr. Kielar does not challenge), the district court never restricted Mr. Kielar's right to cross-examine Dr. Barros about his termination from Medicare or Medicaid, or any other issue for that matter. Thus, the only

---

[26] Appellant's Br. 24.

reason why these questions were not asked, the Government submits, was because "defendant's trial counsel made the strategic decision not to ask [them]."[27]

The Government's assessment is correct. As the record clearly demonstrates, Mr. Kielar reached an agreement with the Government about how the parties would handle Dr. Barros's termination from Medicare and Medicaid. When the Government objected that defense counsel's cross-examination of Dr. Barros was treading beyond the scope of that agreement, the district court merely asked defense counsel whether this was his last question on the matter. In response, defense counsel stated that all he wanted to do was clarify the dates on which Dr. Barros was terminated from Medicaid as opposed to Medicare, because he believed that the witness had confused those dates during his direct examination. The court allowed defense counsel to clarify this issue, suggesting that he "tie it up" in "one last question" "and then move on."[28] Notably, the court concluded its suggestion by asking the parties, "Fair enough?", to which defense counsel expressed no objection.[29] In light of the parties' earlier acknowledgement that they had "worked out a solution" in which Dr. Barros would "testify that he was terminated from Medicare and Medicaid in the early 2000–2001 time period" and "then that [would] be the end of the issue,"[30] defense counsel's decision not to object to the court's proposed solution, or to otherwise attempt to further

---

[27] Appellee's Br. 41.

[28] R.153 at 30.

[29] *Id.*

[30] R.151 at 2.

question Dr. Barros on this issue, was intentional. Accordingly, we conclude that Mr. Kielar has waived any objection concerning this issue.[31]

In any event, even if the district court had precluded Mr. Kielar from questioning Dr. Barros about his termination from Medicare and Medicaid, that decision would not have constituted reversible error under either Rule 608(b) or the Confrontation Clause. Rule 608(b) bars the admission of extrinsic evidence "to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." Fed. R. Evid. 608(b). Under this rule, however, a district court may permit, in its discretion, a party to cross-examine a witness about such prior conduct so long as it is probative of the witness's character for truthfulness. *Id.* Rule 608(b) operates subject to the limitations imposed by the Confrontation Clause of the Sixth Amendment, which protects the right of a criminal defendant "to be confronted with the witnesses against him." U.S. Const. amend. VI.

As a general matter, we review a district court's limitation on the scope of cross-examination for abuse of discretion. *United States v. Sasson*, 62 F.3d 874, 882 (7th Cir. 1995).

---

[31] *See United States v. Cooper*, 243 F.3d 411, 418 (7th Cir. 2001) (holding "that a defendant's attorney can waive his client's Sixth Amendment confrontation right so long as the defendant does not dissent from his attorney's decision, and so long as it can be said that the attorney's decision was a legitimate trial tactic or part of a prudent trial strategy" (internal quotation marks omitted)); *see also United States v. Donelli*, 747 F.3d 936, 939, 941 (7th Cir. 2014) (concluding that a defendant waived any objection concerning the district court's failure to consider adequately his mitigation arguments at sentencing by not raising that objection when the court asked the parties "whether they had any objection to the sentence or required 'any further elaboration' of the judge's reasons").

Where, however, a limitation "directly implicates the core values of the Confrontation Clause," our review is de novo. *United States v. Recendiz*, 557 F.3d 511, 530 (7th Cir. 2009) (internal quotation marks omitted). In determining the appropriate standard of review, it is important, therefore, to "distinguish between the core values of the confrontation right and more peripheral concerns which remain within the ambit of the trial judge's discretion." *United States v. Degraffenried*, 339 F.3d 576, 581 (7th Cir. 2003) (quoting *United States v. Saunders*, 973 F.2d 1354, 1358 (7th Cir. 1992)).

It is well established that "[e]xposing witness bias lies within the protected core of the Confrontation Clause." *United States v. Sanders*, 708 F.3d 976, 990 (7th Cir. 2013) (internal quotation marks omitted). We also have recognized, however, that the constitutional guarantee is limited to the opportunity to expose the bias: "a limitation on cross-examination implicates the core of the Confrontation Clause when the defense is completely forbidden from exposing the witness's bias." *Id*. (internal quotation marks omitted). "So long as the accused is given the opportunity to expose bias, further cross examination is at the discretion of the district court." *United States v. Smith*, 308 F.3d 726, 738 (7th Cir. 2002); *see also Recendiz*, 557 F.3d at 530 ("[O]nce a trial court permits a defendant to expose a witness's motivation, it is of peripheral concern to the Sixth Amendment how much opportunity defense counsel gets to hammer that point home to the jury." (internal quotation marks omitted)).

In this case, the fact that Dr. Barros was terminated from participating in Medicare and Medicaid was exposed to the jury; both the Government and defense counsel questioned the doctor on this topic. Thus, because Mr. Kielar was "given

the opportunity to expose [this potential ground for] bias, further cross examination [was] at the discretion of the district court." *Smith*, 308 F.3d at 738. A district court does not abuse its discretion in this context so long as "the jury had sufficient information to make a discriminating appraisal of the witness's motives and biases." *Recendiz*, 557 F.3d at 530 (internal quotation marks omitted). Here, the fact of Dr. Barros's termination alone gave the jury enough information to appraise the witness's motive to lie. Mr. Kielar's counsel could well have argued forcibly to the jury that Dr. Barros's removal from the government programs gave him a strong motive to deny writing the prescriptions in question because any such admission might have resulted in further problems with federal or state regulatory authorities. Indeed, an examination of the transcript at closing argument indicates that his counsel made some attempt to do so.[32] In any event, assuming for the sake of argument that this issue was not waived, it is clear that the cross-examination that did take place gave defense counsel enough opportunity to make his point.

Therefore, assuming the district court had restricted Mr. Kielar's cross-examination of Dr. Barros, that limitation would not have been an abuse of discretion. *See Sanders*, 708 F.3d at 991 (noting that just because "[t]he jury might not have possessed all the information [the defendant] wanted it to have" does not mean that the jury lacked "sufficient information to evaluate [the witness's] testimony"). Accord-

---

[32] *See* R.154 at 148 ("And Dr. Barros. [The prosecutor] also asked what does Dr. Barros have to gain. Well, what Dr. Barros has to gain is he is not sitting right here.").

ingly, waiver aside, Mr. Kielar's evidentiary challenge fails on its merits.

## C.

Finally, Mr. Kielar contends that the district court erred by preventing him from calling Fernando Perez as a defense witness. We review the district court's evidentiary rulings for abuse of discretion. *United States v. Khan*, 771 F.3d 367, 377 (7th Cir. 2014).

## 1.

Prior to trial, the Government listed Fernando Perez as a potential witness. Perez, a former patient of Dr. Barros and a customer at the Cartagena Pharmacy, was slated to testify that Dr. Barros never had prescribed Procrit for him. When the Government later elected not to call Perez, defense counsel informed the Government of his intent to call the witness. In response, the Government moved to preclude Mr. Kielar from calling Perez. When asked by the district court why he intended to call Perez, defense counsel explained that he intended to impeach the witness's credibility. In particular, defense counsel stated that, when called, Perez would "deny that he was ever prescribed Procrit, [or] that he ever got any Procrit," and that defense counsel would then impeach the witness by asking whether he had stolen his cousin's identity and whether he was an illegal alien (both of which defense counsel believed were true).[33]

---

[33] R.153 at 126.

The Government objected to this proffer, asserting that defense counsel was "calling [Perez] solely for the purpose of impeaching him."[34] In response, the court asked defense counsel whether "that[ was] all there [was] to it," to which defense counsel responded, "That's all there is to it, Judge."[35]

When asked whether he intended to ask Perez any other questions, defense counsel responded that he also might ask the following: "The government told you that they were going to call you as a witness and then sometime during the trial you were—on a certain date you were interviewed and the government told you that they were not going to call you as a witness."[36]

The next day, the court granted the Government's oral motion in limine. Relying on our decision in *United States v. Giles*, 246 F.3d 966 (7th Cir. 2001), the district court ruled that Mr. Kielar's counsel could not call Perez as a defense witness because his only reason for doing so was to impeach him.

## 2.

It is well established that "a party may not call a witness for the sole purpose of impeaching him." *Id.* at 974. In *Giles*, as here, a defendant sought to call as a witness an individual who was slated to testify for the Government but whom the Government chose not to call at trial. *Id.* We affirmed the dis-

---

[34] *Id.*

[35] *Id.* at 127.

[36] *Id.*

trict court's decision to preclude the defendant from calling this individual, concluding that the defendant's "true defense reason…for wanting to put [this witness] on the stand was to expose his warts to the jury and float the inference that the [Government] should not play footsie with a sleaze-ball." *Id.*

Mr. Kielar attempts to avoid *Giles*'s clear holding by asserting that impeachment was not the "*only* reason" that he wanted to call Perez as a witness.[37] In particular, he contends that although "trial counsel believed Mr. Perez would *likely* testify that he was never prescribed Procrit by Dr. Barros…[,] trial counsel was willing to make the tactical decision that under oath Mr. Perez may testify that he was prescribed Procrit."[38]

Mr. Kielar never communicated to the district court this reason for permitting Perez's testimony. We therefore refuse to consider this theory of admissibility for the first time on appeal. *See United States v. Biesiadecki*, 933 F.2d 539, 544 n.1 (7th Cir. 1991); *United States v. Marrera*, 768 F.2d 201, 209 (7th Cir. 1985); *see also Stephens v. Miller*, 13 F.3d 998, 1008 n.5 (7th Cir. 1994) (en banc) (Rovner, J., concurring) ("A defendant cannot advance one reason for admitting evidence during trial and then advance a wholly separate basis for admission…on appeal. An evidentiary rationale not raised before the trial judge at the time of ruling is waived."). Because Mr. Kielar's only proffered reason for calling Perez as a defense witness was to impeach him, we conclude that the dis-

---

[37] Appellant's Br. 26 (emphasis in original).

[38] *Id.* at 26–27 (emphasis in original).

trict court's decision to grant the Government's motion in limine was proper.

## Conclusion

The judgment of the district court is affirmed.

AFFIRMED