In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-3631

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHARLES PETRUNAK,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:14-cr-00094-WTL-TAB-1 — **William T. Lawrence**, *Judge.*

ARGUED FEBRUARY 21, 2017 — DECIDED MAY 4, 2017

Before WOOD, *Chief Judge*, and FLAUM and ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge*. On May 6, 2014, Charles Petrunak was indicted on three counts of making and subscribing false and fraudulent IRS forms, in violation of 26 U.S.C. § 7206(1). The counts corresponded to IRS forms 1096, 1120S, and 1040, filed by Petrunak. A jury convicted him on all counts, and he was sentenced to 24 months' imprisonment.

Petrunak now argues that the court erred in excluding certain evidence at his trial and he also challenges his sentence.

Petrunak was a pyrotechnician who was the sole proprietor of Abyss Special FX, Inc. ("Abyss), a pyrotechnic and aerial fireworks business engaged in providing outdoor and indoor fireworks displays. Because Abyss was a pyrotechnic business, it was regulated by the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). In September 2001, two ATF inspectors, Jill Krofta and Manuel Vicario, conducted a mandatory inspection of Abyss and filed a report detailing violations found in that inspection. Petrunak challenged the violations in an administrative hearing conducted in June 2003 at which Krofta and Vicario testified. The administrative law judge found Petrunak in violation of explosives regulations and revoked his explosives license. Petrunak was therefore unable to work with fireworks and explosives, and Abyss went out of business.

About five years later, Petrunak targeted Krofta and Vicario who he apparently blamed for the demise of his company. He mailed both of them an IRS W-9 form requesting identifying information, and then sent them an IRS Form 1099 ("1099") alleging that Abyss had paid each of them $250,000. Krofta and Vicario both provided the forms to their supervisors, and filed their taxes indicating only the income they received and therefore excluding the fictional $250,000 payment. Because Krofta's tax return did not include the $250,000 for which a 1099 had issued, the IRS then audited Krofta and informed her that she owed $101,114 in taxes. Krofta was forced to spend a significant amount of time and energy unraveling the situation, and her return was delayed between six months and a year.

In the meantime, Petrunak submitted those sham "payments" as business expenses in submissions to the IRS, characterizing them as payments for "outside services/independent contractors." Petrunak characterizes that as an effort to ascribe his personal and business losses to each of the agents. Shortly thereafter, Petrunak filed Abyss' corporate tax return claiming the $500,000 deduction based on those falsified 1099 payments. Because Abyss was an S-corporation, the proceeds flowed through to Petrunak as the owner and applied to his personal taxes; therefore, he was able to report a loss exceeding $500,000 in his personal taxes in 2008, and could carry that loss forward to offset taxes owed for 20 years until the loss was exhausted.

After the discrepancy in Krofta's tax return became apparent, the IRS began investigating Petrunak as well. He admitted to filing the forms, claiming that he did so based on the illegal loss of licensing for his business as a result of the falsified testimony of Krofta and Vicario at the administrative hearing. He was charged with three counts of making and subscribing false and fraudulent IRS forms in violation of 26 U.S.C. § 7206(1), corresponding to the IRS Forms 1096, 1120S, and 1040 which included the fraudulent claims.

Petrunak acknowledged sending the 1099s and claiming the deduction, but asserted that he believed he suffered personal and business income loss because the inspectors lied at the administrative hearing. He maintained that he tried to contact the IRS on multiple occasions and was referred to an IRS Publication, and that he concluded that he could use the IRS 1099- Miscellaneous income forms to ascribe his losses to the agents, but he did not intend for the 1099s to represent that he paid each inspector $250,000 in income. To bolster his

contention, he sought to introduce evidence of Abyss' corporate meeting minutes.

Petrunak argues that the corporate meeting minutes should have been admitted under the business records exception. He claims that those minutes included references to his reduced income, income tax losses, and concerns regarding those matters. He claims that the records would have demonstrated his state of mind in preparing the tax forms. Included in the minutes are statements such as the following:

> Need to mention that there was a verbal conversation with an IRS representative. She said that issuing the 1099s and to write off the losses from the business were acceptable. However she would not be specific to my situation.

In addition, it included statements bemoaning that the IRS was not more helpful, and declarations that the ATF agents perjured themselves in the case.

Under the business records exception in Federal Rule of Evidence (FRE) 803(6), records of regularly conducted activity, made at or near the time of the transaction, are excluded from the hearsay rule unless "the source of information or the method of preparation indicate a lack of trustworthiness." Such records are presumed reliable because businesses depend upon them for the operation of their own affairs, and therefore there is little incentive to falsify such records, and because the regularity of such record-keeping leads to habits of accuracy. *Jordan v. Blinn*, 712 F.3d 1123, 1135 (7th Cir. 2013).

The district court excluded the records in this case, and we review that determination only for abuse of discretion. *United States v. Kielar*, 790 F.3d 733, 744 (7th Cir. 2015). The court noted that the records contained multiple instances of hearsay, and that it lacked evidence that the business records exception applied to the minutes. That determination by the district court was not an abuse of discretion. The purported "minutes" were created by Petrunak, who by his own admission, as the"sole employee," was the sole attendee at the meetings. He acknowledges that there was no one else there to even transcribe minutes. Moreover, the minutes he submitted to the court are not even the originals, which he shredded, but are reproductions apparently prepared in 2010, at a time in which the IRS was already investigating him. None of the indicia of reliability that render business records reliable are present here, in that there is no indication that the records are relied upon for the operation of Abyss' affairs, and the destruction of the originals casts doubt on whether the minutes submitted were actually made at or near the time of the meeting, or produced or altered in light of the impending litigation. *Jordan*, 712 F.3d at 1135 ("documents prepared with an eye toward litigation raise serious trustworthiness concerns because there is a strong incentive to deceive"). The absence of any attendees at the meetings and the timing of the decision to transcribe the minutes all support a determination that the "source of information or the method of preparation indicate a lack of trustworthiness." FRE 803(6)(E). Accordingly, the evidence was properly excluded.

Petrunak also challenges the calculation of his sentence, arguing that the court erred in calculating his Guidelines range by incorrectly determining the tax loss to be $140,000.

We review the district court's calculation of the tax loss for clear error. *United States v. Black*, 815 F.3d 1048, 1051 (7th Cir. 2016). In order to demonstrate clear error, a defendant must show that the tax loss calculations by the district court were not merely inaccurate but "outside the realm of permissible computations." *Id*.

Petrunak argues that U.S.S.G. § 2T1.1(c), which defines tax loss, is intended to reflect the revenue that the government was owed but did not receive due to the defendant's criminal conduct. He argues that the district court's calculation is incorrect because it determined the tax loss not based on what is owed to the government, but on the amount of improperly claimed deductions.

This argument is without merit. Section 2T1.1(c) provides that "[I]f the offense involved tax evasion or a fraudulent or false tax return, statement or other document, the tax loss is the total amount of loss that was the object of the offense (i.e. the loss that would have resulted had the offense been successfully completed)." Therefore, the intended loss is the proper focus, and includes any loss that would have occurred had the offense been completed. *Black*, 815 F.3d at 1051. The total loss that was the object of the offense in this case was the $500,000 tax deduction. Because of the potential for a 20-year carryover of that tax deduction, the specific loss amount could not be ascertained by the court. Section 2T1.1(c)(1)(B), however, provides for the method of calculating the loss in such situations, providing:

> (B) If the offense involved improperly claiming
> a deduction of an exemption, the tax loss shall
> be treated as equal to 28% of the amount of the
> improperly claimed deduction or exemption

> (34% if the taxpayer is a corporation) plus 100% of any false credits claimed against tax, unless a more accurate determination of the tax loss can be made.

The district court applied the most conservative number under that framework, calculating the tax loss amount as 28% of $500,000 for a total of $140,000. Petrunak cannot show that a more accurate determination of the tax loss can be made, and therefore the calculation was proper under the Guidelines.

The decision of the district court is AFFIRMED.